# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ANDRE RICH,

      PLAINTIFF,

v.                                 CASE NO.: CV-08-J-2259-S

WAL-MART STORES, INC.,

      DEFENDANT.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 17), evidence and brief in support of said motion (docs. 17-18), plaintiff's brief and evidence in opposition (docs. 24-27), and the defendant's reply (doc. 29). Having considered the pleadings, evidence and memoranda of the parties, the court finds as follows:

## I. Factual Background

Plaintiff sued his past employer for violations of Title VII, 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. § 1981, as amended, for race discrimination and retaliation in terminating him.

The plaintiff began working for the defendant in April 1999 as a general transportation manager trainee for defendant in a North Carolina facility. Plaintiff depo. at 13, 87, 91. He first transferred to Tennessee and later, in 2000, he transferred

as an operations manager to defendant's transportation office[1] in Cullman, Alabama, where he worked until he was terminated in January 2007.[2]  Plaintiff depo. 24-25, 91-92, 96, 98.  Several positions reported to him, including the driver coordinators.[3]  *Id.* at 136.  The plaintiff was described as a pretty good employee by his supervisor.  Mackentepe depo. at 102.  His performance evaluations were typically "exceeds expectations."  Plaintiff declaration, ¶ 4.  He had no write ups or disciplines prior to the incident that forms the background for this action.  *Id.*, ¶ 6.

In December 2006 the plaintiff gave candy mints in pill bottles with sexually explicit and old-age references printed on them to five individuals he supervised, as a joke.[4]  Plaintiff depo. at 76-77.  Each year, his office had a "dirty Christmas" party

---

[1]The Cullman facility serves as a distribution center for approximately 90 Wal-Mart stores.  Mackentepe depo. at 26.

[2]The plaintiff makes a vague allegation that the transfer to Cullman, Alabama, in 2000 was discriminatory, although he never filed any internal complaint or took any other action to contest it.  Plaintiff depo. at 118-119, 122.  As that transfer occurred 8 years prior to this action being filed, any such claim is long since time barred.  He also alleges that race played some role in the fact that he was not promoted.  *Id.*, at 123-124.  However, plaintiff did not pursue the administrative prerequisites to filing a suit on any failure to promote claim in a timely manner.  *Id.*, at 135.  He also never directly expressed interest to anyone regarding any specific position.  *Id.*, at 128.

[3]The plaintiff was one of three operations managers at the Cullman facility, the other two being Carolyn Cecil and Rickey York.  Plaintiff depo. at 137.  All three of them reported to Donna Mackentepe, the general transportation manager for the Cullman facility.  Defendant exhibit 10 to plaintiff deposition; Mackentepe depo. at 21.  They each supervised driver coordinators, which were hourly positions.  Plaintiff depo. at 138.

[4]The recipients were Susan Finch, B.J. Henderson, Pat Young, Kay Tolbert and Margie Girard.  Plaintiff depo. at 222.  All of them are females over 40 years old.  *Id.*, at 224-225.

in which everyone exchanged gifts and could swap them.  Plaintiff depo. at 206-207.

The coordinators always brought the plaintiff a gag gift.  *Id.*; Mackentepe depo. at

103; plaintiff exhibit 15 to Jenkins depo.  Thus, in 2005, the plaintiff gave gag mints

as gifts to the coordinators.  Plaintiff depo. at 208; Mackentepe depo. at 103.  In 2006

he could not find the exact same thing, so he bought something he thought was close

without looking at the back of the bottles.  Plaintiff depo. at 209-210, 215.  One of

the recipients asked if he had read the back of the bottle and the plaintiff responded

"no."  *Id.*, at 217.  He looked at it, saw a curse word, and said "I made a mistake."[5]

*Id.*  The plaintiff told Mackentepe, who was there, that he had "messed up," and she

responded that he needed to read the bottles in the future, but told him not to take

them back.  *Id.*  She also told him everything was okay, that he had apologized, and

that it was a mistake.  *Id.* at 218.

The driver coordinators were not upset with the gag gifts and in fact showed

them to numerous drivers.  Plaintiff depo. at 79-82; Mackentepe depo. at 104.  Once

plaintiff learned what was on the bottles and went to Mackentepe, she told him they

would be lucky if they did not have problems from it.  Mackentepe depo. at 104;

Jenkins depo. at 123.

---

[5]The language on these bottles is contained, in part, in defendant exhibit 14 to plaintiff
deposition.

The plaintiff was terminated January 17, 2007, for this incident.  He asserts his termination was because he is African American, and that other employees outside his protected class were not terminated for similar actions.  Plaintiff depo. at 116, 123.

The plaintiff received an employee handbook and training on defendant's anti-harassment and anti-discrimination policy, referred to as "PD-19."  Plaintiff depo. at 106, 109; defendant exhibit 6 to plaintiff deposition.  He also had "inappropriate behavior" training.  Plaintiff depo. at 112.  He agrees that the gifts were a mistake and a violation of those policies.  *Id.*, at 233; defendant exhibit 6 to plaintiff deposition.  Thus, the plaintiff expected to receive some discipline, but not to be terminated.  Plaintiff depo. at 233.

The plaintiff blames his termination in part on his reporting a comment by Carolyn Cecil in 2006.  Plaintiff depo. at 139; defendant exhibits 12 and 13 to plaintiff deposition.  At a meeting between Cecil, plaintiff, York, and Donny James, the shop manager, Cecil referred to one of the drivers as "white trash."  Plaintiff depo. at 140-143; Cecil depo. at 23-24.  No one else was present.  Plaintiff depo. at 141.  Based on his training, plaintiff thought this comment violated defendant's harassment and inappropriate conduct policy, which states that the defendant will not tolerate such violations.  *Id.*, at 144.  Plaintiff felt the comment was offensive to him because

as a member of management, he is held to a higher standard.  Plaintiff depo. at 147.

He reported Cecil's comment to Mackentepe and to Human Resources, because he

thought it was a racial slur.  *Id.*, at 148-149, 177; defendant exhibit 13 to plaintiff

deposition; Mackentepe depo. at 82-83.  *See also* Fuller depo. at 41-44.  Plaintiff

thought Cecil should have disciplinary action taken against her because it was a slur

against an employee, even though that employee is the same race as Cecil.  Plaintiff

depo. at 179-181.  Mackentepe immediately called Gery Fuller, the HR manager at

the time, and told him to get more information to determine if a Red Book

investigation needed to be conducted.[6]   Mackentepe depo. at 83.   After an

investigation, Cecil was issued a Step 2 discipline.  *Id.* at 84, 89; Cecil depo. at 26-29.

The plaintiff blames his termination on Cecil because he believes she reported

the gag gifts to Human Resources.  Plaintiff depo. at 171-172.  He testified:

> Let me say this.  I had no understanding or no knowledge that Carolyn
> was the person that filed the complaint with Bentonville.  Let me make
> that clear.  It's my contention that I was terminated because of some
> bottles of mints that I gave the coordinators.  When I got into my EEOC
> hearing, I was told that the complaint was raised by Carolyn Cecil.  I had
> no knowledge of that.  And I was like, Carolyn, I didn't get Carolyn any
> mints, what's the complaint about.

---

[6]Defendant's discrimination and harassment prevention policy, PD-19, prevents discrimination and harassment, and applies to hourly and salaried job applicants, customers, job applicants, and suppliers of defendant.  Mackentepe depo. at 39; Jenkins depo. at 66-67.  A violation of that policy is typically handled through a "Red Book" investigation. Mackentepe depo. at 39, 41-42; Jenkins depo. at 68.

Plaintiff depo. at 172-173.

According to the plaintiff, Cecil was upset because when the plaintiff complained about her "white trash" comment, Cecil was disciplined, rather than being given a chance to apologize. Plaintiff depo. at 175-176; plaintiff exhibit 8 to Jenkins deposition.   However, when Human Resources first learned about the plaintiff's gag gifts, he was told an apology would be sufficient. Plaintiff depo. at 226. Because of the lack of any complaints, what actually happened, and plaintiff's offer to apologize, Mackentepe decided to let the plaintiff apologize for offending anyone. Mackentepe depo. at 106.

Several weeks after the party, the plaintiff was informed by Deb Jenkins, human resources manager for the Cullman facility, that while none of the coordinators were offended, Susan Finch's husband was offended. Plaintiff depo. at 174, 225, 231; defendant exhibit 10 to plaintiff deposition; Mackentepe depo. at 105-106. *See also* plaintiff exhibit 15 to Jenkins depo. Jenkins heard rumors that some of the driver coordinators were upset about the language on the bottles, but no one came out and said he or she was upset. Jenkins depo. at 118-122. Jenkins suggested that since no formal complaint had been filed, plaintiff apologizing and offering to take the gifts back and replace them might be enough. *Id.*, at 124; plaintiff declaration, ¶ 23. Jenkins called Fred Ward, the regional personnel manager, which she was required to do in the event of an incident like this, and he agreed that since

6

no formal complaint had been filed, the apology would be sufficient.[7]  Jenkins depo.
at 125; Ward depo. at 9.   The plaintiff was told to apologize again, and he did.
Plaintiff depo. at 226, 231.

Thereafter, Cecil went to Jenkins and told her it was unfair that she was given
a disciplinary action while the plaintiff was allowed to apologize.  Jenkins depo. at
128-129.  Jenkins told Cecil that the difference was that no one complained about
plaintiff.  *Id.* at 131.  Meanwhile Mackentepe learned Cecil had called Tim Johnson,
the regional transportation manager, because the plaintiff was allowed to apologize
whereas she was given a step 2 warning.  Mackentepe depo. at 107, 114; Jenkins
depo. at 158-159; Johnson depo. at 14, 27.  Cecil told Johnson that she thought her
Step 2 discipline should be removed from the file so that she was treated the same as
the plaintiff.[8]  Johnson depo. at 27-28; Cecil depo. at 31-35.  Jenkins did not see this
as Cecil trying to get leverage against the plaintiff, but rather complaining that the
policy was being administered inconsistently.  Jenkins depo. at 132-133.

After Cecil went to Johnson, Fred Ward told Jenkins to begin a Red Book
investigation, which she did.  Jenkins depo. at 134-135; Ward depo. at 18; Johnson

---

[7]Fred Ward reported to Ed Parrish.  Boudreaux depo. at 22.

[8]Cecil was not present when the gifts were handed out and did not know exactly what
they were. However, she was present at the meeting where plaintiff again apologized for the
gifts.  Cecil depo. at 41.  She called Johnson to get her discipline reduced, not to have plaintiff
disciplined.  *Id.*, at 44.

depo. at 29.  From the interviews, Jenkins learned that the driver coordinators were not offended, did not think the plaintiff intended to offend anyone, and no one suggested that the plaintiff should be fired.  Jenkins depo. at 136-140; defendant exhibits 14 and 15 to plaintiff deposition; plaintiff exhibits 15 and 16 to Jenkins deposition.  The plaintiff expected to be disciplined, but not terminated.  Plaintiff depo. at 233-234; defendant exhibit 15 to plaintiff deposition. After the investigation, Mackentepe and Jenkins recommended no more than a Step 3 discipline.[9] Mackentepe depo. at 108; Jenkins depo. at 143, 145-146; Johnson depo. at 30. Johnson thought this was the minimum appropriate punishment.  Johnson depo. at 31. However, plaintiff was fired instead because he had "broken trust, lost the respect of the associates that reported to him, and, as a result, we felt that he would be unable to lead his associates."  Johnson depo. at 32.

Bryan Boudreaux, vice president of eastern operations, made the actual decision to terminate the plaintiff.  Johnson depo. at 34; Boudreaux depo. at 18-19, 35.  Boudreaux was contacted by either Fred Ward or Tim Johnson because of the severity of the allegations.  Boudreaux depo. at 32-33.  He made the decision to terminate because the language on the bottles was clearly a violation of defendant's policy.  *Id.* at 35-36.

---

[9]Jenkins and Mackentepe had authority to recommend discipline but their regional manager could accept or reject their recommendation.  Jenkins depo. at 116-117.

The plaintiff learned from Deb Jenkins and Donna Mackentepe he was going to be terminated. Plaintiff depo. at 239; defendant exhibit 16 to plaintiff deposition. Mackentepe spoke with Boudreaux to see if the plaintiff could be relocated rather than terminated because she did not agree with the decision. Mackentepe depo. at 108-109, 115. Jenkins did not think the plaintiff deserved to be terminated either. Jenkins depo. at 154.

After his termination, the plaintiff used defendant's open door policy to call Boudreaux and say he thought termination was too severe.[10] Plaintiff depo. at 244, 259-260. Boudreaux told plaintiff he would look into it and call him back. *Id.*, at 261. Boudreaux called him back several days later and told the plaintiff he would uphold the termination. *Id.,* at 262. Boudreaux stated that because Mackentepe was out at the time due to family health issues, he was counting on plaintiff to run the office and the plaintiff made a "very dumb mistake," causing Boudreaux to question plaintiff's ability to make sound decisions.[11] Boudreaux depo. at 36.

---

[10]Under defendant's open door policy, an employee can call the next level of management to dispute a disciplinary decision. Mackentepe depo. at 40.

[11]According to Boudreaux, during this time period, the defendant was having discussions about laying off associates in the Cullman office and

> ... quite frankly Andre's fumble ... his lack of leadership with this issue really
> concerned me about the changes that we were going to have to make in Cullman.
> The fact that Andre supervised many of the ladies that were potentially going to
> be laid off and displaced, and it really concerned me that he could make such a big
> mistake, violating this harassment policy, and how that was going to be played out
> with the associates that could be laid off ... and how they might not turn that

When asked why he thought his termination was discriminatory, the plaintiff said he offered to be sent to another location, but Boudreaux told him

> No, I can't send you to another location. In fact, I can't even bring you back because I'm getting ready to lay people off so why would I bring you back.  And I'm getting ready to lay people off or reassign or reposition some of these coordinators because of the new software we got.

Plaintiff depo. at 253-254.  Somewhere in this conversation, Boudreaux told plaintiff "I talked with legal and I can't bring you back .... I don't have the power to bring you back."  *Id.* at 276.

The plaintiff next called Tim Yatsko, Senior Vice President over transportation and Boudreax's supervisor.  Plaintiff depo. at 265; Jenkins depo. at 63.  They had a long conversation, and Yatsko told him he would look at everything and call plaintiff back.   Plaintiff depo. at 266.   Ed Parrish, Director of Human Resources, Transportation, called the plaintiff back on Yatsko's behalf, and told him that Yatsko was going to uphold the termination.  *Id.* at 266; Parrish depo. at 11-12.  The plaintiff then called Johnnie Dobbs, Executive Vice President over transportation.[12]  Plaintiff

---

around on us....

Boudreaux depo. at 37.

[12]The plaintiff testified that he never called Johnnie Dobbs, but his attorney at the time sent Dobbs a letter,  Plaintiff depo. at 269-271.  He then states that he did call Dobbs, but did not speak with him.  *Id.* at 271.

depo. at 267.  Several days later, the plaintiff received a call from a regional manager stating that they were going to launch an investigation.  *Id.*, at 267, 272.  The plaintiff never heard anything else from defendant.  *Id.*

## II. Standard of Review

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  An issue is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997).

The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *See* Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005).

### III.  Legal Analysis

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Sprint/United Management Co.* 246 F.3d 1305, 1311 (11th Cir.2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000). With these standards in mind, the court considers the plaintiff's claims.

***Race Discrimination:***

A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing

sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination. *Wilson v. B/E Aerospace, Inc,*. 376 F.3d 1079, 1088 (11th Cir. 2004), citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147-48, 120 S.Ct. 2097, 2108-09, 147 L.Ed.2d 105 (2000).

Plaintiff asserts that the above facts establish he was discriminated against because of his race.  As the court finds no direct evidence of discrimination, the court applies the analysis required for circumstantial evidence.  This court must apply the three prong test fashioned by the Supreme Court in  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973).  *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981).  First, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee.  *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997).  Assuming the employee meets this burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th

Cir.1996).   The defendant can feasibly present such strong evidence of a non-discriminatory rationale that summary judgment is warranted.  *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir.1991), *cert. denied,* 502 U.S. 1058 (1992)(quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 596 (11th Cir.1987).

Once a defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094 and n. 10.  The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.  The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment action directed at plaintiff. *Harris*, 99 F.3d at 1083.

Title VII prohibits employers from discriminating against employees on the basis of race.  *See* 42 U.S.C. § 2000e-2(a) (2003).  To establish a prima facie case for discriminatory termination, the plaintiff must show that: (1) he was a member of a protected class, (2) he was qualified for the job, (3) he suffered an adverse employment action, and (4) his employer treated similarly-situated employees outside

his protected class more favorably.[13]   *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir.2003).   When a plaintiff alleges discriminatory discipline, the plaintiff "must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Smith v. Sunbelt Rentals, Inc.*, 2009  WL 4672443, 4 -5 (11th Cir.2009), citing *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989).

The parties do not dispute that the plaintiff has established the first three elements of his prima facie case.  The defendant argues that the plaintiff cannot meet the fourth element, namely that a similarly situated, non-minority employee was treated more favorably.  As stated in *Jones*, to establish a prima facie case, a plaintiff must show "that he engaged in misconduct similar to that of a person outside the protected class [a comparator], and that the disciplinary measures enforced against him were more severe than those enforced against the [comparator]." *Jones*, 874 F.2d. at 1540.  The law of the Eleventh Circuit requires that the quantity and quality of the

---

[13]Claims brought pursuant to § 1981 have "the same requirements of proof and use[s] the same analytical framework" as Title VII. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).  Thus, the court's discussion of the plaintiff's claims pursuant to Title VII is fully applicable to his §1981 claims as well. *See e.g., Johnson v. City of Mobile, Ala.*, 321 Fed.Appx. 826, 830 n.2 (11th Cir.2009)(noting that because both statutes have the same requirements, the court "shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999); *see also Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997) (stating that to make a comparison, the plaintiff must show that he and the comparable employee are "similarly situated in all relevant respects"). The court may "not sit as a super-personnel department that reexamines an entity's business decisions," but the "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000) (quotation marks and citation omitted).

The court has carefully read the evidentiary submissions. The evidence establishes that the plaintiff made a mistake. He gave inappropriate gifts to subordinate employees. The evidence further establishes that the plaintiff recognized his "gag gifts" were inappropriate, apologized for them, and expected to be disciplined. The plaintiff contests only the discipline selected, namely termination, and no the finding that he violated the defendant's anti-discrimination and anti-harassment policy. The plaintiff asserts that other violators of the policy were not terminated and, thus, the decision to terminate him must have been based on his race. The defendant defends its decision as a matter of degree, in that the language contained on the bottles plaintiff handed out to subordinates was much more

16

offensive than the other violations of PD-19 pointed out by plaintiff for comparison purposes.

A comparator is an employee "similarly situated [to the plaintiff] 'in all relevant respects.'" *Wilson*, 376 F.3d at 1091 (quoting *Holifield*, 115 F.3d at 1562). The "'quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Burke-Fowle*r, 447 F.3d at 1323 (quoting *Maniccia*, 171 F.3d at 1368) (citation omitted). *See also Wilson*, 376 F.3d at 1091. Misconduct merely "similar" to the misconduct of the disciplined plaintiff is insufficient. *Burke-Fowler,* 447 F.3d at 1323 n. 2.

The most striking distinction between the plaintiff and each of his named comparators is that none of them was a salaried member of management. Rather, the plaintiff points to two truck drivers, a mechanic, and a driver coordinator. Plaintiff's memorandum (doc. 24) at 11-13. None of them was in a supervisory position equivalent to that of the plaintiff. The Eleventh Circuit has held:

> Admittedly, differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim. *See Lathem [v. Dep't of Children and Youth Svcs.*, 172 F.3d 786, 793 (11th Cir.1999)] (different job titles not dispositive). Here, however, rank clearly matters .... It cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from the Chief's immediate advisors,

who are held to a higher level of professionalism and who are expected
to set the standard of conduct for the department."

*Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1281 (11th Cir.2008).  As the Court

noted in *Rioux*, conduct treated with progressive discipline at lower ranks is not

necessarily tolerated at a higher level of management, who are held to a higher level

of professionalism and who are expected to set the standard of conduct for the

department.[14]  *Id. See also Smith v. Sunbelt Rentals, Inc.*  2009 WL 4672443, 7 (11th

Cir.2009)(noting plaintiff and comparator "held a different rank and had different job

responsibilities.").  Even the plaintiff recognized that as a member of management,

he is held to a higher standard, as this is the very reason he gave for reporting Cecil's

comment.  Plaintiff depo. at 147.

The court has also considered whether Carolyn Cecil is a valid comparator.

While she held a position equivalent to that of plaintiff's, neither her conduct nor the

decision maker in her discipline was similar.   The plaintiff attributes some

discriminatory purpose to the fact that Brian Boudreaux did not get involved in the

discipline of the plaintiff until after Cecil called Johnson.  Plaintiff's memorandum,

---

[14]The defendant recognizes this, asserting that plaintiff's actions could have subjected it
to vicarious liability under the *Farager/Ellerth* line of cases.  Defendant's memorandum, at 17.
See *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d
662 (1998); *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633
(1998).  Here, the plaintiff was a supervisor of driver coordinators, to whom the bottles were
given.

at 17.   However, no evidence supports such an inference of discrimination.   The evidence establishes that Cecil, displeased that she was given a Step 2 discipline for calling a truck driver "white trash" while plaintiff was merely allowed to apologize, went over Mackentepe and up the chain of authority to see if the previous Step 2 discipline she received would be removed from her file.   In that manner, upper management became aware of the incident involving the plaintiff.

The court finds Cecil is not an appropriate comparator because the quantity and quality of her misconduct is not "nearly identical" to that of plaintiff's.   While both Cecil and plaintiff were disciplined for violations of the same policy, and while Cecil received a lesser punishment, her "white trash" comment in a closed door meeting where the object of her scorn was not present, is fundamentally different than giving five subordinates fake pills with sexually explicit and age disparaging labels.   See e.g., *Burke-Fowler*, 447 F.3d at 1325 (noting differences in degree of conduct prevents comparator from being "nearly identical"); *Silvera v. Orange County School Brd.,* 244 F.3d 1253, 1259 (11th Cir.2001); *Maniccia*, 171 F.3d at 1368-1369.

Even if the court could find that the plaintiff established a prima facie case, the court would still grant judgment in favor of the defendant based on its legitimate, nondiscriminatory reason, which the plaintiff has failed to rebut. After Cecil went to Johnson, Fred Ward told Jenkins to begin a Red Book investigation, which she did.

Jenkins depo. at 134-135; Ward depo. at 18; Johnson depo. at 29. After the investigation, Mackentepe and Jenkins recommended no more than a Step 3 discipline. Mackentepe depo. at 108; Jenkins depo. at 143, 145-146; Johnson depo. at 30. Johnson thought this was the minimum appropriate punishment. Johnson depo. at 31. However, plaintiff was fired instead because he had "broken trust, lost the respect of the associates that reported to him, and, as a result, we felt that he would be unable to lead his associates." Johnson depo. at 32.

Boudreaux made the actual decision to terminate the plaintiff, because the language on the bottles was clearly a violation of defendant's policy. Boudreaux depo. at 35-36. The fact that the plaintiff gave these "gifts" to the very subordinates who were potentially going to be laid off "really concerned [Boudreaux] that he could make such a big mistake, violating this harassment policy, and how that was going to be played out with the associates that could be laid off ... and how they might not turn that around on us...." *Id.*, at 37.

In other words, defendant terminated plaintiff's employment, in part, out of fear that defendant could be sued for age or sex discrimination by the driver coordinators who received the bottles, especially if one of these coordinators was selected for proposed layoffs. Although the plaintiff testified he did not mean to offend anyone and even that no one was offended, this is not a relevant inquiry for the court. The

20

plaintiff has presented no evidence that the defendant took his race into consideration when it elected to fire him.

The plaintiff further alleges Boudreaux's testimony that he always thought highly of the plaintiff is inconsistent with his testimony that the incident in question made him question the plaintiff's ability to lead, and therefore establishes pretext. In doing so, the plaintiff actually complains not about his termination, but the fact that his termination was not rescinded. *See* plaintiff's memorandum, at 23. Regardless, the court finds the two statements of Boudreaux are not inconsistent. Boudreaux's testimony is elaboration of the reasons why plaintiff was fired and why he was not transferred, and thus not evidence of pretext. See e.g., *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir.1998) ("[E]xplanation of a general reason is insufficient to show pretext.").

Similarly, whether or not any of the gift recipients was offended is not a proper issue for the court. Rather, the proper issue is whether or not the defendant reasonably believed that the plaintiff violated its anti-harassment policy and believed that the defendant could be held liable for those violations. The Eleventh Circuit has explained that

> ...a defendant may terminate an employee for a good or bad reason
> without violating federal law. *See Elrod v. Sears, Roebuck & Co.*, 939
> F.2d 1466, 1470 (11th Cir.1991). We are not in the business of adjudging

whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984)....

*Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999).

*See also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). The court's role is not to act as a super personnel department that second-guesses employers' business judgments. *Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253 (11th Cir.2000). Because the court finds that the plaintiff has failed to identify a relevant comparator and further, that even if plaintiff had done so, defendant has put forth legitimate, non-discriminatory reasons for its actions, which plaintiff has failed to rebut, the defendant is entitled to judgment in its favor on the plaintiff's claim for race discrimination.

### *Retaliation*

Under the McDonnell Douglas framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action. *Bryant v. Jones* 575 F.3d 1281, 1307-1308 (11th Cir.2009)*, citing Raney v. Vinson Guard Serv. Inc*., 120 F.3d 1192, 1196 (11th Cir.1997); *Goldsmith v. City of Atmore*,

22

996 F.2d 1155, 1163 (11th Cir.1993). These three elements create a presumption that the adverse action was the product of an intent to retaliate. Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *See Goldsmith*, 996 F.2d at 1163. After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions. *See Raney*, 120 F.3d at 1196.

In support of his prima facie case, the plaintiff claims his termination was in retaliation for reporting Cecil's "white trash" comment, which he asserts was protected activity.[15]  As noted by plaintiff, "[w]hen Cecil observed Rich apologize for the gifts, she determined that a double standard applied."  Plaintiff's memorandum, at 21.  The plaintiff asserts that "Cecil's only reason for calling Johnson was to get back at Rich for reporting her earlier as any discipline she had received had fallen off

---

[15]The court assumes, for purposes of this opinion only, that plaintiff's reporting of a white employee calling another white employee "white trash," in a closed door meeting which was not heard by the employee so disparaged, is actually conduct protected by Title VII, i.e., unlawful discrimination against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (no reasonable person could believe that one sexually offensive comment created hostile working environment)*; Little v. United Tech., Transcold Div.,* 103 F.3d 956 (11th Cir.1995) (co-worker's single derogatory racial slur against African Americans was not attributable to employer so as to render it an unlawful employment practice for the purpose of a retaliation claim).

her record by this time." Plaintiff memorandum, at 22.  This is contradicted by the evidence (as opposed to argument) in front of the court, namely that Cecil was seeking to have her discipline reduced.  *See* Cecil depo. at 44; Jenkins depo. at 132-133.  The plaintiff then makes the leap from this statement to that Boudreaux must have had knowledge of Cecil's discipline based on the fact that Boudreaux had worked at the Cullman facility seven years earlier.  Plaintiff memorandum, at 22. Whether or not Boudreaux had knowledge of Cecil's discipline has no relationship to whether plaintiff was really terminated in retaliation for reporting Cecil, and not for his own poor judgment.  While plaintiff argues this establishes that "the sole reason Boudreaux terminated Rich ... is that Cecil made complaints of disparate discipline," just making this argument does not mean there is evidence of it or that it establishes a causal connection.

To establish a causal connection, a plaintiff must show "that the protected activity and adverse action are not wholly unrelated." *Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1354 (11th Cir.1999) (quoting *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985)).  This element is satisfied where the plaintiff provides "sufficient evidence that the decision-maker became aware of this protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.,*

197 F.3d 1322, 1337 (11th Cir.1997). "It is not enough for the plaintiff to show that

someone in the organization knew of the protected expression; instead, the plaintiff

must show that the person taking the adverse action was aware of the protected

activity." *Bass v. Bd. of County Comm'rs,* 256 F.3d 1095, 1119 (11th Cir.2001);

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir.2000) ( "To establish a

causal connection, a plaintiff must show that the decision-maker[s] [were] aware of

the protected conduct, and that the protected activity and the adverse action were not

wholly unrelated."). However, the only evidence regarding Boudreaux's knowledge

of plaintiff's protected activity, namely reporting of Cecil, is Boudreaux's testimony

that he learned about it when the plaintiff told him while contesting his own

termination.[16]

The plaintiff cannot show any causal connection between his reporting of Cecil

and his termination, other than Cecil reported that plaintiff received a less severe

discipline (he had to apologize) than she did. Even if Cecil did so in retaliation (for

which there is no evidence), the court cannot attribute that retaliatory motive to the

---

[16]Plaintiff asserts that because Boudreaux worked in Cullman from May of 1999 until December of 1999, his assertion he did not know of Cecil's discipline, "requires the willing suspension of disbelief"(sic). Plaintiff's memorandum, at 22. Plaintiff fails to explain how Boudreaux's six or seven month employment with Cecil seven years prior to the events in question would mean he knew everything occurring in Cullman at the time in question, late 2006 or earlier 2007, when Boudreaux was the Vice President for Eastern Operations and working in Bentonville, Arkansas. Boudreaux depo. at 18-20.

decision maker, Boudreaux, who knew nothing of the revenge motive of Cecil at the time he made the termination decision.  While plaintiff's termination certainly was harsh, this court's agreement or disagreement with that decision is irrelevant.

> Title VII addresses *discrimination*. Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason ... does not have to be a reason that the judge or jurors would act on or approve.

*Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984) (citations and internal quotation marks omitted)(emphasis in original).

Having considered the foregoing, the court is of the opinion that the evidence before the court fails to establish that the plaintiff was terminated in retaliation for his reporting of a co-worker's derogatory remark.  As such, judgment shall be granted in favor of the defendant and against the plaintiff on this count of the plaintiff's complaint.

## IV.  Conclusion

The court having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact on any of his claims sufficient

to allow this case to proceed to trial, the court **ORDERS** that the defendant's motion

for summary judgment is hereby **GRANTED**.

    **DONE** and **ORDERED** this the 6th  day of January, 2010.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE